HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA ex rel.
MARGARET COOK, relator,

        Plaintiff,

  v.

PROVIDENCE HEALTH & SERVICES,
et al.,

        Defendants.

CASE NO. C13-1312RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Defendants' motion to dismiss.  Defendants requested oral argument; Plaintiff did not.  The court finds oral argument unnecessary. For the reasons stated below, the court GRANTS the motion to dismiss.  Dkt. # 22.  The court declines Plaintiff's request for leave to amend, and thus directs the clerk to DISMISS this action with prejudice and enter judgment for Defendants.

## II.  BACKGROUND

The court describes the facts as Plaintiff Margaret Cook alleges them in her operative complaint, suggesting no opinion as to whether she can prove those allegations.

Ms. Cook is a former employee of Health Services Asset Management, LLC ("HSAM").  HSAM is responsible for collecting medical bill payments from patients of various health care providers under the Providence umbrella.  Ms. Cook points to six Providence entities who provide health care services in Washington, Oregon, Idaho,

ORDER – 1

Montana, and Alaska.  Because it is not necessary to separately identify the Providence provider entities, the court will refer to them collectively as "Providence."  HSAM is a Providence subsidiary; it collects payment solely from Providence patients.

Providence provides health care to patients who are either beneficiaries of the Medicare and Medicaid programs or are eligible to be beneficiaries of those programs. For purposes of this order, it suffices to observe that Medicare is a federally-administered health insurance program for people over the age of 64, and that Medicaid is a health insurance program jointly administered by the federal government and participating states for the benefit of people with low incomes.  When a health care provider seeks reimbursement for services to Medicare or Medicaid beneficiaries, it must submit a claim to either the federal government (for Medicare) or a state agency (for Medicaid).

According to Ms. Cook, HSAM is at best a poorly-run organization that routinely makes errors with respect to Providence patient bills.  It routinely fails to credit patient accounts when it receives payment from Medicare, Medicaid, private insurance programs, third parties, and the patients themselves.  Ms. Cook was one of HSAM's many bill collectors.  When she complained to her supervisor about HSAM's failure to properly credit patient accounts, she met with little success.

Providence, meanwhile, engages in practices that ensure that its bills are routinely in error by the time HSAM begins to collect on them.  Providence routinely fails to identify patients who are eligible for Medicare or Medicaid, and fails to identify private insurance (whether belonging to the patient or to a third party who may be liable to the patient) that may cover a patient's medical care.  In addition, Providence's physicians often erroneously describe the services they provide, and Providence's billing administrators often assign incorrect billing codes, leading to the denial of Medicare and Medicaid claims.  At least in part because of these practices, Providence routinely bills Medicare and Medicaid beneficiaries (or patients eligible to be Medicare or Medicaid beneficiaries) directly.  When it does so, it bills at much higher rates than the rates at

ORDER – 2

which Medicare and Medicaid reimburse it.  Patients sometimes fight against these improper billing practices, but some pay rather than fight.

If Ms. Cook's allegations are correct, Providence and HSAM are fleecing some of their patients.  Some of those patients are paying even where Medicare or Medicaid has already paid for their services, and they are paying at higher rates.  Patients who know they should owe nothing sometimes pay just so that HSAM will cease its collection efforts.  Even if they succeed in convincing HSAM to bill correctly, they are forced to expend time quarreling with HSAM.

The difficulty underlying Ms. Cook's complaint is that she is not suing on behalf of Providence's fleeced patients, she is suing Providence and HSAM on behalf of the federal government via the False Claims Act.  She invokes 31 U.S.C. § 3730(b), the portion of the False Claims Act that permits qui tam suits, in which a private actor (the "relator") files suit on behalf of the United States against a defendant who has violated 31 U.S.C. § 3729(a)(1), the portion of the Act that prohibits false claims.  The United States has already declined its option to intervene and pursue the action.  *See* 31 U.S.C. § 3730(b)(2)-(4) (regulating government's election to intervene).  The question is whether Ms. Cook has stated a qui tam claim that she can continue to pursue.

Defendants' motion to dismiss points out the incongruities in Ms. Cook's approach to remedying their alleged wrongdoing.  The False Claims Act addresses false claims to the federal government, not wrongdoing toward private parties like Providence's patients.  Providence is not overbilling Medicare or Medicaid, it is overcharging its patients.  Ms. Cook's theory is that Providence makes false claims by falsely certifying, as part of the process of participating in Medicare and Medicaid, that it has complied with all applicable Medicare or Medicaid statutes and regulations.  Those certifications are false, she alleges, in light of Defendants' improper billing practices.  Although Defendants acknowledge that courts have recognized qui tam claims based on false certifications, they contend that Ms. Cook has not plausibly alleged a false

ORDER – 3

certification claim or any other species of qui tam claim.  Defendants invoke Rule 12(b)(6) and ask the court to dismiss Ms. Cook's complaint for failure to state a claim.  They also contend that Ms. Cook fails to allege fraud with the particularity that Federal Rule of Civil Procedure 9(b) requires.  The court now considers Defendants' motion.

### III.   ANALYSIS

Rule 12(b)(6) permits a court to dismiss a complaint for failure to state a claim.  The rule requires the court to assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations.  *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).  The plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007).  If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief.  *Id.* at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  The plausibility requirement stems from Federal Rule of Civil Procedure 8(a)(2)'s requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief."  To clear that bar, the complaint must state "factual allegations" that, taken as true, "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

A court considering a Rule 12(b)(6) motion typically cannot consider evidence beyond the four corners of the complaint, although it may rely on a document to which the complaint refers if the document is central to the party's claims and its authenticity is not in question.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  The court may also consider evidence subject to judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

ORDER – 4

1

**A.     The False Claims Act and False Certification**

2        The prototypical qui tam action arises where a contractor overcharges the United

3   States, or supplies faulty products or services, or unlawfully manipulates prices.  *United*

4   *States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).  But the False Claims

5   Act encompasses not only explicitly or independently false claims, but claims that arise

6   from false certifications to federal programs.  *United States ex rel. Hendow v. U. of*

7   *Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006).  Federal programs frequently require

8   certification from their participants, either as a prerequisite to enrollment in the program,

9   or as a prerequisite for the submission of each claim for payment from the program.

10  Express false certification claims arise from a false certification of "compliance with a

11  law, rule or regulation as part of the process through which the claim for payment is

12  submitted."  *Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Implied false

13  certification claims arise where "an entity has previously undertaken to expressly comply

14  with a law, rule, or regulation, and that obligation is implicated by submitting a claim for

15  payment even though *certification* of compliance is not required in the process of

16  submitting the claim."  *Id.* (emphasis in original).  Courts also recognize "promissory

17  fraud" claims, in which all claims from an entity that gained admission to a government

18  program through false statements or fraudulent conduct are deemed false.  *Hendow*, 461

19  F.3d at 1173 ("In other words, subsequent claims are false because of an *original fraud*

20  (whether a certification or otherwise).") (emphasis in original).

21       The only theory of recovery that Ms. Cook's complaint addresses in any detail is

22  an implied false certification claim based on Providence's certifications in connection

23  with its enrollment in Medicare and Medicaid.[1]  The complaint is silent as to whether

24  Providence's individual claims for payment to Medicare or Medicaid require an express

25  certification of anything; it therefore states no express false certification claim.  The

26

27  _____
    [1] Ms. Cook's complaint contains conclusory allegations as to other types of false claims, which
    the court addresses in Part III.G.

28  ORDER – 5

complaint does not allege that Providence made culpably false statements to become a Medicaid or Medicare provider; it therefore states no promissory fraud claim.

A plaintiff pleading a false certification qui tam claim must include allegations establishing four elements: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174. Ms. Cook's complaint lacks allegations that plausibly satisfy several of these requirements. Because that is the case, the court need not decide whether Ms. Cook has complied with Rule 9(b), which requires her to plead the circumstances of fraud with particularity. *See United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011) ("Because they involve allegations of fraud, qui tam actions under the FCA must meet . . . the particularity requirements of Rule 9.").

## B. Searching for Providence's Certifications

Ms. Cook's false certification claims depend on certifications contained in various "provider agreements." The provider agreements to which she points, however, are not Providence's provider agreements, but rather "sample" agreements from the federal government (for Medicare) and "sample" agreements from Washington, Oregon, Idaho, Alaska, and Montana (for Medicaid). Ms. Cook does not allege that Providence executed provider agreements that are materially identical to these samples. Ms. Cook says nothing about the vintage of the sample forms on which she relies. Are they recent or out-of-date? The court can only guess. Ms. Cook says nothing about when provider agreements for Medicare and Medicaid must be executed. Does a provider execute them only at the outset of its enrollment, or must it resubmit them periodically? Providence may well have executed its last provider agreements years ago in substantially different formats than the sample forms on which Ms. Cook relies. Ms. Cook's effort to state a plausible false certification claim gets off to a rocky start, because she has not identified a certification that *Providence*, as opposed to a "sample" provider, executed. Nonetheless,

ORDER – 6

because Defendants do not harp on Ms. Cook's failure to refer to any provider agreement that Providence executed, the court will assume for its remaining analysis that the sample agreements are essentially identical to provider agreements that Providence executed.

The sample provider agreements on which Ms. Cook relies impose a range of conditions. The Medicare agreements include the following certification:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Compl., Ex. A (institutional provider agreement) at § 15; *see also id.*, Ex. B at § 15 (materially identical certification for individual practitioners).[2] That is at least a promising beginning for a false certification claim, because it informs a provider that every subsequent claim carries with it an implicit certification of compliance with Medicare law, regulations, and other conditions.

Whereas the Medicare provider agreements explicitly require compliance with statutes, regulations, and instructions *as a condition of payment of a claim*, the Medicaid provider agreements do not. Instead, they contain bare agreements to comply with applicable statutes, rules, regulations, and the terms of the agreements themselves. *E.g.*, Compl., Ex. C (Washington agreement, stating that the provider "agree[s] to abide by the terms of this Agreement[,] including all applicable federal and state statutes, rules, and policies"), Exs. D, F (Oregon and Idaho provider agreements stating that the provider will "abide by [the agreement's] terms and conditions,"). At least two of the agreements include an agreement to comply with a set of laws and regulations that would fill a room:

> The Provider hereby agrees to comply with all applicable laws, rules and written policies pertaining to the Montana Medicaid Program (Medicaid), including but not limited to Title XIX of the Social Security Act, the Code of Federal Regulations (CFR), Montana Codes Annotated (MCA), Administrative Rules of Montana (ARM) and written Department of Public

---

[2] The "complaint" that the court cites in this order is Ms. Cook's second amended complaint. Dkt. # 16. She filed it after Defendants filed a motion to dismiss her first amended complaint, identifying essentially the same pleading defects as in this motion.

ORDER – 7

Health and Human Services (Department) policies, including but not
limited to policies contained in the Medicaid provider manuals, and the
terms of this document.

Compl., Ex. E (Montana provider agreement).  The Alaska provider agreement similarly

requires compliance with every Alaska statute, every Alaska regulation, every federal

statute or regulation related to Medicaid, as well as the agreement itself.  Compl., Ex. G.

Even assuming that Ms. Cook has alleged a violation of one or more of the

thousands (or perhaps tens of thousands) of statutes, regulations, rules, and agreement

terms encapsulated in the Medicaid provider agreements,[3] she has not alleged that

Providence must certify its compliance with those regulations in order to make a claim

for payment.  The Medicaid agreements do not require, even implicitly, that a provider

certify compliance with laws, regulations, agreements, or anything else when a provider

makes a claim.  For that reason, Ms. Cook fails to identify a false statement in connection

with any Providence Medicaid claim.  Without a certification of compliance (express or

implied), there can be no false certification claim:

Violations of laws, rules, or regulations alone do not create a cause of
action under the FCA.  It is the false *certification* of compliance which
creates liability when certification is a prerequisite to obtaining a
government benefit.

*Hopper*, 91 F.3d at 1266 (emphasis in original); *see also Hendow*, 461 F.3d at 1171.

With respect to her claims based on false Medicaid claims, Ms. Cook is indistinguishable

from the unsuccessful relator in *Hopper*.  There, the relator based her qui tam claim on a

school district's violation of regulations pertaining to the Individuals with Disabilities

Education Act ("IDEA.").  *Hopper*, 91 F.3d at 1264.  Her false certification claim failed

in part because "the IDEA does not require funding recipients to certify their compliance

---

[3] Although Ms. Cook occasionally uses her complaint to point out a specific provision of a
provider agreement that Providence has violated, she often is content to fill her complaint with
conclusory allegations of violations of rules and regulations coupled with the barest citation.
Particularly egregious is a paragraph in which she lists at least 20 federal regulations and 5
Washington regulations, reveals nothing about the content of those regulations, asserts without
elaboration that Defendants violated all of them, then asserts that "this is not an exclusive list of
laws and regulations violated by the defendants."  Compl. ¶ XVIII.  That is not acceptable
pleading practice.

ORDER – 8

with federal laws and regulations," and in part because "regulatory compliance was not a *sine qua non* of receipt of state funding."  *Id.* at 1267.

The Medicaid provider agreements contain promises to comply with rules and regulations when billing, but those promises are not the basis for a false certification claim.  For example, the Washington Medicaid provider agreement contains agreements to "submit claims for services rendered . . . in accordance with rules and Medicaid Provider Guides" and to "accept as sole and complete remuneration the amount paid in accordance with the reimbursement rate for services covered under the program, except where payment by the client is authorized by applicable rule."  Compl., Ex. C ¶ 3.  Most, if not all, of the provider agreements contain similar agreements about billing.  *E.g.*, Compl., Ex. F ¶ 7.2 (agreement, for Idaho Medicaid providers, "[n]ot to bill the participant unless the item or service is not covered by Medicaid").  Providence may have violated those agreements, but that is a breach of contract, not a false certification.  *See Hopper*, 91 F.3d at 1265 ("It is not the case that any breach of contract . . . automatically gives rise to a claim under the FCA.").  Ms. Cook has not identified any certification, express or implied, that Providence must make in connection with its individual requests for Medicaid payment.  *Cf. Hendow*, 461 F.3d at 1175-76 (observing that a specific statute, regulation, and participation agreement all conditioned the "initial *and continued* participation" of a university in federal student loan program on compliance with a particular rule) (emphasis added).

Because the Medicare provider agreement explicitly requires compliance with a web of statutes, regulations, and the like as a condition for payment of any claim, Ms. Cook has identified at least one certification on which to build her false certification claim.  Even though she has not done so with respect to Providence's Medicaid claims, the court will continue to examine her Medicaid-based assertions.  They, like the Medicare-based assertions, fail to support a viable qui tam claim for other reasons.

ORDER – 9

**C.      Searching for Providence's <u>False</u> Certifications**

To illustrate whether Ms. Cook has pointed to a certification that is false, the court examines a "representative example" that she describes in her complaint.  She contends that she was responsible for collecting from an 85-year-old Medicaid beneficiary (the court will refer to her as "Patient A") even though "Medicaid had paid the patient's account in full."  Compl. ¶ XXVIII.  Ms. Cook requested to her supervisor that HSAM correct Patient A's account to show the Medicaid payment, thereby ending HSAM's efforts to collect directly from Patient A.  *Id.*  Ms. Cook does not explain whether HSAM complied with her request, but she asserts that "accounts were rarely corrected."  *Id.*

Putting aside that Ms. Cook has failed to identify any Medicaid-claim-related certification, the court imagines for the sake of argument that Providence certified, when it requested government reimbursement for services it provided to Patient A, that it was in compliance with all applicable laws, regulations, and the like.  Why was that certification false?  At that time, there is no allegation that Providence had done anything wrong with respect to Patient A.  There is no allegation that Providence had referred Patient A's account to HSAM for private collection *at the time Providence submitted a request to Medicaid for reimbursement for services provided to Patient A*.  There is also no plausible allegation that Providence intended, at the time it submitted a request to Medicaid for reimbursement for services it provided to Patient A, to commence private collection efforts in violation of Medicaid rules.  So if Providence made any false certification at all with respect to Patient A, the certification was false because Providence had violated a law, regulation, or other condition with respect to a different patient or patients.

The court now considers whether Providence made this false certification with scienter and whether the false certification was material.

ORDER – 10

**D.      Searching for False Certifications Made with <u>Scienter</u>**

The False Claims Act does not impose liability for statements merely because they are false; liability requires "a palpably false statement, known to be a lie when it is made." *Hendow*, 461 F.3d at 1172.  At least one of Ms. Cook's allegations flagrantly flaunts this requirement.  She describes a patient from whom HSAM attempted to collect $861.10, even though she would have owed nothing if she had been properly credited for payments from Medicare and private insurance.  Compl. ¶ XXIX.  Rather than alleging that Providence made a false statement when it requested Medicare reimbursement for this patient, she alleges that HSAM's "subsequent illegal collection activity renders the original claim false."  *Id.*  The False Claims Act does not countenance time travel; statements must be false when they are made, or they are not actionable.

Putting aside that egregious example, Ms. Cook falls well short of offering plausible allegations of scienter.  Most notably, there are no allegations that Providence (the collection of entities responsible for submitting claims to Medicare) had any knowledge about HSAM's unlawful efforts to collect money directly from patients.  The sections of the False Claims Act on which Ms. Cook's false certification claims depend require a false statement to be made "knowingly."  § 3729(a)(1)(A)-(B).  The statute defines "knowingly" to encompass not only "actual knowledge" of false information, but also "deliberate ignorance" or "reckless disregard of the truth or falsity of the information."  § 3729(b)(1).  Ms. Cook offers no allegations about what Providence knew or should have known about HSAM's collection activity, and no allegations giving rise to a plausible inference that Providence was deliberately ignoring or recklessly disregarding information about HSAM's unlawful collection activity.  Ms. Cook fails to plausibly allege scienter.

Before considering whether Ms. Cook plausibly identifies a *material* false statement, the court considers her bare assertion that the *Hendow* court allowed a qui tam case weaker than hers to survive a motion to dismiss.  She is mistaken.  In *Hendow*, the

ORDER – 11

court considered a university that violated a federal rule prohibiting universities receiving federal student loan money from compensating recruiters on a per-enrolled-student basis. *Id.* at 1168. That ban, "enacted based on evidence of serious program abuses," ensured that recruiters would not profit from enrolling poorly qualified students who would both derive little benefit from enrollment and who would be unwilling or unable to repay student loans. *Id.* at 1168-69. The university in *Hendow* did not simply violate the ban, it "flagrantly violate[d]" it with full knowledge, created false records designed to cover up its violations, and "openly brag[ged]" about the violations. *Id.* at 1169; *see also id.* at 1175 ("[The relators] allege that University staff openly bragged about perpetrating a fraud, that the University had an established infrastructure to deceive the government, and that the University repeatedly changed its policies to hide its fraud."). The court does not suggest that a successful false certification claim depends on such egregious fraud, but Ms. Cook's allegations suggest no fraud at all. They suggest, at most, widespread billing errors and a reluctance (within HSAM alone) to correct those errors. Those errors did not violate a regulation designed to protect the United States Treasury, they violated a regulation designed to protect patients. Providence's patients may have claims against Providence or HSAM, but the False Claims Act does not empower Ms. Cook to bring those claims on behalf of the United States.

**D.   Searching for <u>Material</u> False Certifications**

A false statement is not material unless it is both a prerequisite to obtaining a government benefit and a sine qua non of the receipt of government funding. *Hendow*, 461 F.3d at 1172; *Hopper*, 91 F.3d at 1266-67. As the court has explained, if Providence made a false certification in connection with any claim for reimbursement for services it provided to a patient, it was to falsely state that it complied with applicable statutes, regulations, and laws even though HSAM had violated those conditions by improper collections from *other patients*. Imagine, then, that Providence had told the "truth" when it submitted a claim on behalf of, for example, Patient A. It would have stated that it had

ORDER – 12

violated applicable conditions by collecting or attempting to collect money directly from other Medicaid beneficiaries.  As the court now explains, it is not plausible that this disclosure would have made any difference to the decision to reimburse Providence for services rendered to Patient A.

Instead of the strict-compliance regime that Ms. Cook imagines, where Providence would not receive reimbursement if the government knew of its errors in collection from other patients, Medicare and Medicaid have rules and regulations that acknowledge those errors and establish procedures for correcting them.  A subpart of the Medicare regulations is devoted to incorrect collections from Medicare beneficiaries and procedures for correcting them.  42 C.F.R. §§ 489.40-489.42.  Washington has a regulation governing not only direct billing of patients, but refunds for improper billing of patients.  WAC § 182-502-0160.  If there has been any instance in which Medicare or Medicaid has declined to reimburse a provider for patient services because of errors the provider made with respect to bills to other patients, Ms. Cook has not identified it, and the court is not aware of it.  Medicare and Medicaid do not treat flawless billing procedures as a sine qua non of reimbursement; they acknowledge that billing errors will occur and provide mechanisms for providers to correct them.  On this record, if Providence had disclosed (for example) in connection with its request for reimbursement for services it provided to Patient A, that it had made a host of billing and collection errors with respect to other patients, Medicaid would simply have instructed Providence to remedy those errors.  It is not plausible to conclude that Medicaid would have refused Providence's reimbursement request.  Ms. Cook has not plausibly alleged that Providence made a material false certification.

ORDER – 13

1

**E.**   **Ms. Cook's False Certification Claim is No More Plausible in Light of the 2009 Amendments to the False Claims Act.**

2

3       Ms. Cook suggests that the court should not follow *Hendow* and *Hopper* in light of

4    amendments to the False Claims Act since the Ninth Circuit decided those cases.  The

     court disagrees.

5

6       Among the provisions of the Fraud Enforcement and Recovery Act of 2009 were

7    amendments to 31 U.S.C. § 3729 in response to the Supreme Court's decision in *Allison*

8    *Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008).  *See Sanders v. Allison*

9    *Engine Co.*, 703 F.3d 930, 934 (6th Cir. 2012) (describing 2009 amendments on remand

10   from Supreme Court).  In *Allison*, the Court interpreted former § 3729(a)(2) which

11   imposed liability on a claimant who "knowingly makes, uses, or causes to be made or

12   used, a false record or statement to get a false or fraudulent claim paid or approved by the

13   Government."  553 U.S. at 668.  It rejected the view that a claim invoking that subsection

14   need only involve a false statement that "resulted in the use of Government funds to pay a

15   false or fraudulent claim," and held that the defendant making the false statement "must

16   intend that the Government itself pay the claim."  *Id.* at 668-69.  Congress rejected that

17   interpretation, transforming former § 3729(a)(2) into § 3729(a)(1)(B), which eliminates

18   the requirement of a false statement "to get a false or fraudulent claim paid or approved

19   by the Government" and merely requires a false statement "material to a false or

20   fraudulent claim."  Consistent with that theme, Congress also amended other portions of

21   § 3729 to eliminate language suggesting that it was necessary to present a false claim

22   directly to the federal government or that it was necessary to intend to defraud the

23   government.  *E.g.*, § 3729(a)(1)(A) (deleting from former § 3729(a)(1) the phrase "to an

24   officer or employee of the United States Government or a member of the Armed forces of

25   the United States"), § 3729(a)(1)(C) (amending former § 3729(a)(3) to replace

26   requirement of conspiracy to "defraud the Government by getting a false or fraudulent

27   claim allowed or paid"), § 3729(a)(1)(D) (amending former § 3729(a)(4) to eliminate

     "intending to defraud the Government or willfully to conceal [Government] property").

28   ORDER – 14

Ms. Cook cites none of this legislative history, asserting instead that the 2009 amendments make a difference that is germane to her case. They do not. Providence does not seek to avoid liability by contending, for example, that its Medicaid reimbursement requests went to state agencies instead of the federal government. Providence also does not suggest that Ms. Cook must prove that it had the intent to defraud. Instead, Providence cites the current statutory language, including its scienter requirement (which is materially identical to the requirement before the 2009 amendments). Although the Ninth Circuit has yet to specifically address the impact of the 2009 amendments, Ms. Cook fails to establish that they make any difference in her case. Like other district courts within the Ninth Circuit who have applied the amended version of § 3729, the court finds that the amendments do not undermine either *Hopper* or *Hendow*. *See*, *e.g.*, *United States ex rel. Ruhe v. Masimo Corp.*, 977 F. Supp. 2d 981, 990-91 & n.4 (C.D. Cal. 2013) (acknowledging 2009 amendments, analyzing false certification claim in accordance with *Hopper* and *Hendow*).

**F.      Summary of Ms. Cook's False Certification Claim**

Ms. Cook states no false certification claim for several reasons. As to Medicaid, she fails to identify any certification that Providence made in connection with reimbursement requests. To the extent she alleges false certifications, she does not plausibly allege that Providence made them with scienter or that they were material.

Stepping back from an element-by-element analysis of Ms. Cook's false certification claim, it is nonetheless plain that it must fail. If Ms. Cook has a viable claim, then any person with information about a Medicare or Medicaid provider's billing errors is a relator empowered to bring a qui tam claim. Any patient who is improperly billed can sue not to recover damages on her own behalf, but on the theory that *every claim* that the provider made for reimbursement on behalf of *any patient* is actionable because the provider falsely certified that it complied with regulations requiring accurate billing and proper bill collection. The False Claims Act is designed to incentivize

ORDER – 15

relators to point out fraud, not to convert the millions of beneficiaries of government programs (as well as personnel who work for private providers implementing those programs) into private attorneys general empowered to sue on behalf of the federal government for any misstep a provider makes in navigating the regulatory web surrounding those programs.

**G.      Claims that Do Not Depend on False Certification**

A few of Ms. Cook's assertions do not rely on a false certification theory, but they are no more adequately pleaded than her false certification claims.

First, she has no claim based on Providence's failure to properly identify patients who are eligible for Medicare or Medicaid.  If Providence does not identify a patient as Medicare- or Medicaid-eligible, Providence will submit no claim on behalf of that patient, and thus will necessarily submit no false claim.

Also unavailing is any claim based on Providence's description, in its requests for payment from Medicare or Medicaid, of the services it provides.  Ms. Cook alleges that physician errors in describing services coupled with administrative errors in "coding" those services for submission, led Medicare or Medicaid to *deny* Providence's claims. Compl. ¶ XII.2-3.  But as the court explained in section III.C, a qui tam claim requires scienter – knowledge that a claim is false and an intent to deceive.  *Hendow*, 461 F.3d at 1172.  Why would Providence intentionally (or recklessly or in deliberate ignorance) make errors that lead to the *denial* of its requests for reimbursement?  Ms. Cook has no answer for that question.  "[I]nnocent or unintentional violations do not lead to False Claims Act liability," *Hendow*, 461 F.3d at 1175, and it is implausible to conclude that Providence acted with any mental state more culpable than negligence when it made mistakes that led to the denial of its claims.

Ms. Cook has not provided adequate allegations to support her claim that Providence deprives the government of subrogation payments.  In a few places in her complaint, she mentions in cursory fashion that when Providence obtains payments from

ORDER – 16

third parties for patient care, it does not "properly account and refund" those payments to Medicare or Medicaid.  Compl. ¶ XII.5(F); ¶ XIII ("The United States is additionally defrauded by Providence's failure to refund to the United States Government and to the various states the amounts paid by the third party sources, said funds being owed . . . pursuant to subrogation rights . . ."); ¶ XXVI ("Providence also routinely fails to account for and routinely fails to refund the subrogated share of third party recoveries or payments owed to the United States Government.").  But those conclusory statements are all that Ms. Cook offers.  The False Claims Act permits suits based on so-called "reverse false claims," where a party "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the United States."  31 U.S.C. § 3729(a)(1)(G).  Ms. Cook's complaint does not describe a single instance of Providence or HSAM withholding a subrogation payment from the federal government. She does not cite any statute, rule, or regulation that describes Providence's obligation to make subrogation payments to the federal government.  She offers no allegations at all that would permit the inference that Providence withheld subrogation payments with scienter.  Her reverse false claim allegations, in short, fail to plausibly state a claim in violation of Rule 8(a).

Finally, the court considers Ms. Cook's conspiracy claim, which is the only claim she attempts to state against HSAM.  Unlike Providence, HSAM makes no Medicare or Medicaid claims.  Ms. Cook makes no plausible allegation that HSAM makes any other claim within the scope of the False Claims Act.  HSAM can be liable, therefore, only if it "conspire[d] to commit a violation" of other portions of the False Claims Act.  31 U.S.C. § 3729(a)(1)(C).  There are no plausible allegations that HSAM conspired with Providence.  Indeed, other than transmitting bills for collection, there are no allegations that Providence communicated with HSAM.  Ms. Cook fails to plead a conspiracy, and thus fails to state a conspiracy claim against Providence, and fails to state any claim against HSAM.

ORDER – 17

**H.      Ms. Cook's Request for Leave to Amend**

Ms. Cook concludes her opposition to Defendants' motion to dismiss with a request for leave to amend.  Ms. Cook does not acknowledge that she has already amended her complaint twice, once in response to an earlier motion to dismiss.  *See supra* n.2.  She also does not suggest that she can cure the essential defects that the court has identified in her claim.  The court has no reason to believe that Ms. Cook could transform her false certification claim from an improper attempt to invoke the False Claims Act to remedy regulatory violations into a viable claim, particularly because there is no suggestion that she can plead anything about what Providence knew about HSAM's allegedly unlawful billing.  Her other qui tam claims are so thinly pleaded that they do not merit extended discussion, and the court declines to reward that approach to pleading those claims with yet another opportunity to amend.  Putting that aside, Plaintiff does not suggest that she could make additional allegations that would salvage those claims.

### IV.   CONCLUSION

For the reasons previously stated, the court GRANTS Defendants' motion to dismiss.  Dkt. # 22.  The court declines Ms. Cook's request for leave to amend.  The clerk shall DISMISS this action with prejudice and enter judgment for Defendants.

DATED this 18th day of August, 2014.

_Richard A. Jones_
_____
The Honorable Richard A. Jones
United States District Court Judge

ORDER – 18